# EXHIBIT 2

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| BRIAN SPURLOCK; STEVEN MITCHELL; ADAM HUNGER; THOMAS RUSSO; GREG COOPER; STEWART MILNE; NOAH MURRAY; IAN RUTHERFORD; STEVEN FLYNN; JAMES E. BROWN; CHARLES SMALL; DERICK HINGLE; BRAD BARR; and MARK ZEROF; *both individually and on behalf of all others similarly situated*, | **AAA Case No. 01-21-0002-7387**<br><br>**CLAIMANTS/COUNTERCLAIM DEFENDANTS' ANSWER TO COUNTERCLAIM** |
| *Claimants*, | |
| *v.* | |
| IMAGN CONTENT SERVICES, LLC, | |
| *Respondent*. | |
| IMAGN CONTENT SERVICES, LLC | |
| *Counterclaimant*, | |
| *v.* | |
| BRIAN SPURLOCK; STEVEN MITCHELL; ADAM HUNGER; THOMAS RUSSO; GREG COOPER; STEWART MILNE; NOAH MURRAY; IAN RUTHERFORD; STEVEN FLYNN; JAMES E. BROWN; and MARK ZEROF; | |
| *Counterclaim Defendants*. | |

Pursuant to Rule R-5 of the American Arbitration Association's ("AAA") Commercial

Arbitration Rules and Mediation Procedures, Claimants/Counterclaim Defendants Brian Spurlock;

Steven Mitchell; Adam Hunger; Thomas Russo; Greg Cooper; Stewart Milne; Noah Murray; Ian

1

Rutherford; Steven Flynn; James E. Brown; and Mark Zerof (collectively, the "Photographers")[1], by and through undersigned counsel, hereby submit the following answering statement to the counterclaim filed on May 13, 2021 ("Counterclaim") by Respondent/Counterclaimant Imagn Content Services, LLC's ("Imagn").

Photographers incorporate by reference the factual background and claims asserted in their principal Arbitration Demand. With the exception of paragraphs 1 and 7 of the Counterclaim, Photographers deny each of the numbered allegations and legal conclusions stated by Imagn in its Counterclaim. Photographers' overarching response and defenses to the Counterclaim are provided in detail below.

## ANSWERING STATEMENT TO COUNTERCLAIM

Imagn asserts that the Photographers breached their agreements with Imagn by: (1) filing a copyright infringement lawsuit against certain third-party image distributors (the "SDNY Action") "without first receiving Imagn's proper authorization" (Counterclaim ¶ 4); and (2) "continuing to press the SDNY Action even though Imagn has granted Reuters, SIPA, and their sublicensees full releases." (*Id*. ¶ 5.)

Imagn's Counterclaim relies on an absurd and untenable interpretation of the contracts at issue and is meritless as a matter of law.

**I.    The Photographers Are Not Bound By Notice Terms Of A Materially Breached Contract.**

As detailed in their Arbitration Demand, the Photographers have asserted numerous claims against Imagn, including for material breach of contract. They also have filed claims in federal court in the SDNY Action against several image distributors ("the SDNY Defendants") who claim

---

[1] The Counterclaim is not being asserted against Claimants Derick Hingle, Charles Small, and Brad Barr, as they are not plaintiffs in the SDNY Action.

to have received the images at issue and purported licensing rights from Imagn despite (i) Photographers having never received *any* royalties or itemized royalty statements stemming from any purported reseller licenses from Imagn prior to Photographers notifying Imagn of the SDNY Defendants' improper, unlicensed uses; and (ii) the scope of the SDNY Defendants' uses of Photographers' photographs plainly exceeding the scope of any *valid* license that Imagn even *possibly* could have granted given the restrictions on its own licensing authority.[2]  Both of these factors led the Photographers to bring claims against these image distributors in the SDNY Action alleging that they did not lawfully obtain the photographs and do not have a license.

The SDNY Defendants apparently are seeking indemnification from Imagn given its role in the matter, and Imagn now is attempting to foist its liability for its own misconduct onto the Photographers through the Counterclaim.  In other words, Imagn's twisted logic is that the Photographers breached their contracts – and thus must indemnify Imagn – because they failed to obtain "proper authorization" from Imagn to bring claims *against Imagn and its partners* and for which *Imagn itself* is responsible; and Imagn brings this claim pursuant to contracts that Imagn materially breached and nearly a *year* after advising Photographers' counsel of its position regarding the SDNY Defendants and failing to object at any time to Photographers exercising their legal rights under the Copyright Act.  The audacity of Imagn's proposed interpretation of the contracts is dizzying.

The Counterclaim also is baseless as a matter of law, including because Photographers cannot be bound by terms of a contract that Imagn already had materially breached.  *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F. 3d 101, 117 (2d Cir. 2006) ("When a party has breached a contract, that breach may excuse the nonbreaching party from further

---

[2] The only reason that Imagn was not itself named as a defendant in the SDNY Action is because of the mandatory arbitration provision included in the contracts.

performance if the breach is 'material.'"); *Jafari v. Wally Findlay Galleries*, 741 F. Supp. 64, 68 (S.D.N.Y. 1990) ("[W]here a party materially breaches, he has failed to substantially perform the contract, and the other party is discharged from performing his obligation."). A breach is material if it "go[es] to the root of the agreement between the parties." *Septembertide Publ'g, B.V. v. Stein & Day, Inc*., 884 F. 2d 675, 678 (2d Cir. 1989). Further, when a party elects to sue for damages based on a material breach of contract, the contracts (and any remaining obligations therein) are effectively terminated. *See NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd*., 262 F. Supp. 2d 134, 146 (S.D.N.Y. 2003) (holding that "the defendants' invocation of § IV to reopen the case and to obtain a judgment for liquidated damages can only be interpreted as a termination of the contract, and not as a waiver of the plaintiffs' breach that would cause the remaining terms, and the obligations thereto, to remain in force.").

Prior to bringing the SDNY Action, Photographers notified Imagn that it had materially breached their contracts by, *inter alia*, failing to collect and pay out royalties when owed, failing to issue timely/detailed quarterly licensing statements, and failing to maintain any effective system to distinguish between subscription-based and *a la carte* customers and/or free uses of "historical" images. Photographers attempted to resolve these matters without resort to filing claims and also subsequently through formal mediation before AAA, but Imagn refused to cooperate with Photographers including by refusing to provide a copy of the alleged license agreement(s) with the SDNY Defendants or any of its other downstream distribution partners. Given that Imagn was supposed to act as Photographers' licensing agency and that Photographers unquestionably would be direct and intended beneficiaries of any such license agreements, Imagn's refusal to provide Photographers copies of any purported license agreements with these third parties – which, by

contrast, Imagn was supposed to deal with at arm's length – was galling and plainly part of Imagn's ongoing efforts to hide its own self-dealing and other misconduct from Photographers.

Photographers thus had little choice but to bring their claims in the SDNY Action precisely because Imagn repeatedly refused Photographers' reasonable request that it demonstrate that these entities had been issued a valid license and thus lawfully obtained copies of their photographs.  By its own conduct, then, Imagn waived, declined, abandoned, or forfeited any claim that Section 7 of the contracts applied because that provision, even if it were valid, is expressly limited to instances of infringement where the violator had been issued a valid license.[3]

In conjunction with filing the SDNY Action, Photographers also brought these claims against Imagn alleging that it had materially breached their contracts.  Photographers allege that Imagn – as explicit retaliation for asserting these claims – has categorically declined to issue any further credentials to the Photographers and now has removed all of their content from Imagn's licensing platform, thus depriving Photographers of their expectations under the contracts and effectively robbing them of their livelihoods – all while Imagn continues to allow its customers and the SDNY Defendants to publish, distribute, use, and sell Photographers' content while not paying Photographers *anything* for such exploitation.

Imagn's agreement to obtain credentials for Photographers and to sublicense their works and pay royalties according to the contract terms undeniably "go[es] to the root of the agreement between the parties."  Indeed, these were the *only* benefits and expectations of the Photographers in entering into the contracts, and they indisputably are "material" as a matter of law.  *See ARP*

---

[3] And there can be no possible dispute that the burden must fall to Imagn to make such a showing to Photographers because, between the contracting parties, Imagn – and *only* Imagn – has the documentation necessary to make such a showing.  And in light of Photographers' reasonable and good faith concerns that Imagn itself had engaged in misconduct, Imagn could not merely meet this crucial contractual obligation by a mere representation, it must *demonstrate* that the underlying license agreements had been issued to the putative infringers and conveyed a license.

*Films, Inc. v. Marvel Entm't Grp., Inc*., 952 F.2d 643, 649 (2d Cir. 1991) (noting that "failure to tender payment is generally deemed a material breach of contract" and "the district court correctly concluded that the breach by plaintiffs in failing to make the payments and provide the reports required by the 1976 Agreement was material as a matter of law").  As such, any obligation on the part of Photographers to wait for and/or receive "notification" that Imagn did not intend to pursue claims against the SDNY Defendants (2011 Agreement ¶ 7) or grant "permission" for Photographers to do so themselves (2020 Agreement ¶ 7) was nullified by Imagn's own material breaches of the contracts.  Further, the Counterclaim is precluded by Imagn's own refusal to demonstrate that Section 7 even applied as a condition of exercising any putative authority thereunder.

## II.     Section 7 Is Legally Invalid And Unenforceable.

Imagn's Counterclaim also is without merit because the contractual provision it relies on – Section 7 – is contrary to federal law and thus unenforceable.  As detailed more fully in Photographers' principal Arbitration Demand (*see* Count 4, ¶¶ 120-129), a contract purporting to grant a third-party "right to sue" on behalf of a copyright owner, without also transferring exclusive ownership of such rights, is invalid as a matter of law because the Copyright Act permits only copyright owners and exclusive licensees to pursue infringement claims.  *See* 17 U.S.C. § 501(b); *ABKCO Music, Inc. v. Harrisongs Music Ltd*., 944 F.2d 971, 980 (2d Cir. 1991) ("The Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf.") (citing *Eden Toys, Inc. v. Florelee Undergarment Co., Inc*., 697 F.2d 27, 32 n. 3 (2d Cir. 1982), *superseded on other grounds by* Fed. R. Civ. P. 52(a)); *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 280 (S.D.N.Y. 2014) (collecting cases), *aff'd*, 882 F.3d 394 (2d Cir. 2018)). The fact that the word "exclusive" is used in some instances in the contracts does not alone make it an "exclusive license" or transfer of legal title, as required for purposes of conferring standing

to pursue claims under the Copyright Act.  *See DRK Photo*, 998 F. Supp. 2d at 280 ("When determining whether an agreement confers standing, courts look to 'the substance of the agreement, not the labels it uses.'") (quoting *HyperQuest, Inc. v. N'Site Sols., Inc.*, 632 F.3d 377, 383 (7th Cir. 2011) ("The fact that it uses the phrase 'exclusive license' or its equivalent from time to time is something of which we take note, but it is not dispositive. It is the substance of the agreement, not the labels that it uses, that controls our analysis")).

The contracts expressly provide that the Photographers would "retain the copyright to the Images" (2011 & 2020 Agreement ¶ 1) and "shall *at all times* be the sole and exclusive owner of the Images" (2011 Agreement ¶ 3(a) (emphasis added)).  Thus, the only reasonable interpretation of the contracts as a whole is that the parties agreed that Imagn would be the *sole agency* permitted to license and distribute the images submitted to it during the term of the contract, not that submission of images would transfer *exclusive ownership* of their copyrights to Imagn.  Otherwise, several provisions of the contracts would be rendered superfluous, including Section 7 itself given that the right to pursue infringement claims would be part and parcel of any transfer of exclusive rights.  And "retain[ing] the copyright" without *any* of the associated exclusive rights under the Copyright Act would be nothing more than a meaningless rhetorical gesture.  Adopting such an interpretation of the contracts must be avoided under New York law.  *See Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (courts must "safeguard against adopting an interpretation that would render any individual provision superfluous"); *Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613, 618 (S.D.N.Y. 2001) ("The court must consider the entire contract and reconcile all parts, if possible, to avoid an inconsistency.").

Because the Photographers expressly retained copyright ownership of their images "at all times" and the contracts cannot reasonably be construed as a transfer of exclusive ownership rights

to Imagn, Section 7 constitutes a mere transfer of the "bare right to sue," together with a purported notice/permission requirement, which is unenforceable and contrary to law. *See DRK Photo*, 882 F.3d at 415 ("[T]he Copyright Act does not . . . permit DRK to assert those claims when it has received nothing more than the bare right to sue for infringement and has never held an exclusive right under copyright in the photographs."); *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 113-14 (S.D.N.Y. 2012) (holding, in a case with nearly identical terms to those at issue here, that "contract provisions purporting to give a third party the exclusive right to bring a copyright infringement action are 'likely unenforceable.'") (quoting *Wu v. Pearson Educ., Inc*., 277 F.R.D. 255, 266 (S.D.N.Y. 2011)).  This governing and settled law precludes Imagn's Counterclaim as it is a fundamental principal of contract law that a party cannot claim damages based on the breach of a contractual provision that is contrary to public policy and federal statute. *See Vill. of Upper Nyack v. Christian & Missionary All.*, 143 Misc. 2d 414, 421, 540 N.Y.S.2d 125, 130 (Sup. Ct. 1988), *aff'd,* 155 A.D.2d 530, 547 N.Y.S.2d 388 (1989) ("Parties may ordinarily incorporate into their agreements any provisions that are not illegal or violative of public policy, but the general right to contract is subject to the limitation that the agreement must not be in violation of the federal or state constitutions, federal or state statutes . . . or a rule of the common law") (citing 21 NY Jur. 2d, Contracts § 137).

### III.    Even If Section 7 Were Valid, It Does Not Support The Asserted Counterclaim.

Setting aside the fact that the terms of Section 7 are contrary to federal law and were nullified by Imagn's own material breach of contract, interpreting this provision to apply under these circumstances cannot possibly have been the intent of the parties and would lead to an absurd result, contrary to New York law. *See Cole v. Macklowe*, 99 A.D.3d 595, 596, 953 N.Y.S.2d 21 (1st Dept. 2012) (noting the "well settled principle that a contract should not be interpreted to

produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties").

Imagn asserts that, prior to filing the SDNY Action, the Photographers did not receive formal notice delivered in person or by certified/registered mail indicating that Imagn had chosen not to pursue such claims itself or – solely in the case of the 2020 Agreement – had not granted the Photographers "permission" to file suit themselves, and thus are in breach of Section 7.  But this ignores and, particularly with respect to the Photographers under the 2020 Agreement, is contradicted by the fact that Imagn did advise Photographers' counsel in writing that it would not pursue such claims.  Given Imagn's clear notice that it would not pursue the claims, no other "permission" would be needed, otherwise the contracts would permit the absurd result that Imagn could refuse to pursue claims and yet not permit the copyright owner to exercise its own rights under federal law.  Photographers relied on this notice in good faith and moved forward with their claims in the SDNY Action.  Imagn's *belated* assertion that the Photographers should not have relied on Imagn's own written notice that it would not pursue these claims and that they instead were required to wait (indefinitely) to receive notice in the mail[4] and/or to obtain some other additional "permission" to pursue claims from the same entity that is responsible for the claims in the first place would be futile, as obviously Imagn would not pursue such claims itself nor grant the Photographers permission to pursue claims against its own interests.

Reading Section 7 in such a way, as Imagn's Counterclaim requires, would be objectively unreasonable and against public policy as it would permit Imagn to act in Photographers' name and on their behalf (*i.e.*, as an agent) despite its own intractable conflicts of interest and transform this provision into a catch-and-kill right for Imagn to protect itself and the partners it involved in

---

[4] During a global pandemic, no less.

its scheme.  *See Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc*., 135 A.D.2d 891, 892, 522 N.Y.S.2d 292, 293 (3d Dept. 1987) ("where it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent"); *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co*., 946 F.2d 1003, 1009 (2d Cir. 1991) (affirming the principle that, where "strict adherence to [a contractual provision] would have been a 'useless act'" and "futile, [it] should thus be excused").

## IV.     Section 7 Cannot Apply Here Because Imagn Has Failed To Allege, Let Alone Show, That The Photographs Were "Lawfully Obtained" By Third-Party Distributors.

Section 7 of the 2011 Agreement is expressly limited to instances of "unauthorized use by any customer who *lawfully* obtained Images from Agency" (emphasis added).  The Photographers allege in the SDNY Action that the defendants did ***not*** "lawfully" obtain their photographs and did ***not*** have a valid license to resell the Photographers' images prior to doing so, not just that they exceeded the scope of any purported license.  (*See* Imagn Answer, Ex. 2 at ¶ 44 (alleging, *inter alia*, that "Defendants did not obtain a license or proper authority to sell and distribute Plaintiffs' image archives on an *a la carte* basis prior to doing so").)[5]

Again, prior to filing the SDNY Action, the Photographers first approached Imagn and asked for proof of a license to these distributors.  Imagn outright refused to produce any purported license agreements and still has not done so despite this being a material aspect and necessary

---

[5] Imagn asserts that Photographers have taken a contradictory position in this arbitration, by alleging that Imagn "acted in direct violation of the Contributor Agreements either by ignoring or allowing its subscription customers to sub-license Claimant's content on an *a la carte* basis" (*see* Imagn Answer at 9-10, n.3).  But the two are not mutually exclusive; it can both be true that the SDNY Defendants did not obtain a proper license prior to reselling Photographers' photos and Imagn breached its contractual obligations and duties by willfully ignoring and/or allowing that to occur for several years *after the fact*.  In any case, Photographers are permitted to plead claims in the alternative, particularly where the SDNY Defendants and their own agency refused to cooperate with their pre-filing inquiries.

condition of its own Counterclaim.  Photographers have located thousands of instances of their photographs being used, published and sub-licensed by the SDNY Defendants, but had never received any payments related to these uses and thus reasonably believed (and do allege in the SDNY Action) that the uses by the defendants were *unlawful* and *not* covered by a valid license. As such, Section 7 of the 2011 Agreement would not apply.

Moreover, several of the SDNY Defendants did not receive the images directly from Imagn, but instead obtained them through an intermediary entity (*e.g.*, Reuters) and thus are sub-sub-licensees.  Thus, at least under the 2011 Agreement, claims against those 4th- and 5th-party distributors would not be subject to the Section 7 requirements in any case.

To the extent that Imagn breached the contracts by providing the SDNY Defendants unfettered, unpaid-for rights and access to the Photographers' entire library of images, such images were not "lawfully obtained" and such claims would not be subject to Section 7.  And that only makes sense because otherwise Imagn would be free to *unlawfully* distribute the Photographers' images or systematically "look the other way" on massive amounts of infringement – which is precisely what has happened – and Photographers would have no recourse because they would be at the mercy of receiving Imagn's blessing to pursue claims which involve Imagn's own unlawful conduct.  That is an absurd result and cannot possibly be permitted under the law.

At a minimum, Imagn cannot invoke any supposed authority under Section 7 without first demonstrating that Section 7 applies.  In this case, Imagn was expressly advised that Photographers do not agree that the SDNY Defendants had obtained the photographs "lawfully" and thus demanded proof that a *valid* license had been issued.  Imagn's response by e-mail claiming that the uses had been "licensed" was not sufficient as it merely begged the question.[6]  Unless and until

---

[6] It also bears noting the inherent contradiction in Imagn purporting to accept payment for settling and releasing claims in 2020 while simultaneously representing to Photographers and

Imagn shows that the photographs were "lawfully" obtained, it has not properly shown any right to even invoke its purported authority under Section 7. Photographers repeatedly requested that Imagn make such a showing and afforded Imagn every possible opportunity to meet that obligation, including agreeing to a confidentiality agreement to protect any financial information from public disclosure. Making such a showing is a necessary predicate under the contracts, and yet even now Imagn still has not offered any documentation of any supposed valid license agreements. As such, Imagn has not yet met its obligations necessary to trigger the requirements of Section 7 and thus it cannot possibly have any claims against Photographers thereunder.

## V. Imagn Forfeited, Waived, and/or Abandoned Any Purported Authority To Pursue Or Settle Photographers' Claims And It Is Estopped From Belatedly Claiming Such Authority Now.

Throughout the summer of 2020, Imagn made clear through several written communications to Photographers' counsel that it believed any claims against the SDNY Defendants would be "baseless" and that it would not pursue such claims. For several months, Imagn was fully aware that Photographers intended to pursue claims against these third-party distributors and ultimately filed the SDNY Action, and yet it did not invoke any right to pursue such claims itself and did not object to the Photographers doing so. Indeed, Photographers filed suit in the SDNY Action in October 2020 and agreed with Imagn to mediate their contract claims in November 2020, and yet Imagn never once advised Photographers that it objected to their filing

---

arguing here that there was no basis for any claims. Nor does Imagn address why it insisted on Reuters providing usage "statements" going forward as a "condition" of any release, if its prior license agreements with Reuters were consistent with Imagn's contracts with the Photographers, which necessarily would have required the prior "Contributor Agreement" to already have required complete usage tracking and reporting *as well as* making appropriate royalty payments to the Photographers. And if Imagn's prior agreement(s) with Reuters failed to include such requirements, Imagn fails to explain why it misrepresented to Photographers that the concerns were invalid or why it accepted such a paltry settlement payment for claims on behalf of a group of hundreds of photographers involving hundreds of thousands of photographs going back nearly a decade.

the SDNY Action or believed that they had breached their contracts and it certainly never sought to intervene in the SDNY Action. Now, *many months after* Photographers filed the action against the third-party resellers and only *after* proceeding with mediation with Photographers related to these same claims, Imagn claims it can reassert its supposed authority under Section 7 to settle Photographers' allegedly "baseless" claims pursuant to a purported contractual right that it failed to exercise or invoke previously.

In filing suit, the Photographers reasonably relied on Imagn's implied admission that it had "[chosen] not to pursue any legal action" on Photographers' behalf or seek any type of settlement from those parties. Rather than providing the actual license agreements that would confirm its representations to Photographers, as requested multiple times, Imagn did nothing for several months, purposefully choosing to sit on its purported rights, and only attempted to assert such rights after an unsuccessful attempt to mediate the claims with Photographers and knowing that the SDNY Defendants would need to file an answer. As such, Imagn forfeited or waived any right it purportedly had to settle the claims, and it is estopped from asserting its rights under this provision now. *See Am. Int'l Grp. Europe S.A. (Italy) v. Franco Vago Int'l, Inc*., 756 F. Supp. 2d 369, 380 (S.D.N.Y. 2010) ("A party has waived a contractual right when it voluntarily and intentionally abandons the enforcement of that right" and "[w]aiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage."); *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 232 (1959) (noting the fundamental estoppel maxim that "no man may take advantage of his own wrong."); *Coggins v. Cty. Of Nassau*, 615 F.3d 11, 30 (E.D.N.Y. 2009) (a party's delay or inaction can support equitable estoppel, which "may arise even though there was no intention on the part of the party estopped to relinquish or change any existing right"); Melville B. Nimmer & David Nimmer, 4 NIMMER ON

COPYRIGHT § 13.07[A] (2002) ("estoppel may be accomplished by silence and inaction, particularly if prolonged").

## VI.   Imagn's Counterclaim Is Precluded By Its Own Conflict of Interest and Unclean Hands.

Imagn's Counterclaim also should be rejected due to its own intractable conflict of interests, as explained more fully above, and under the doctrine of unclean hands. *See Genger v. Genger*, 120 A.D.3d 1102, 1104, 993 N.Y.S.2d 297, 299 (2014) ("When a fiduciary has a conflict of interest in entering a transaction and does not disclose that conflict to his/her principal, the transaction is voidable at the option of the principal" and "an agent cannot bind his principal . . . where he is known to be acting for himself, or to have an adverse interest") (internal quotes and citations omitted); *Smith v. Long,* 281 A.D.2d 897, 898, 723 N.Y.S.2d 584, 587 (2001) ("The unclean hands doctrine rests on the premise that one cannot prevail in an action to enforce an agreement where the basis of the action is 'immoral and one to which equity will not lend its aid'") (quoting *Muscarella v. Muscarella,* 93 A.D.2d 993, 994, 461 N.Y.S.2d 621 (1983)).

Again, prior to filing the SDNY Action, Photographers requested the license or agreements with the third-party resellers – which they are undoubtedly direct and intended beneficiaries of – but Imagn refused to provide it.  Even in the prior AAA mediation, Imagn maintained that any supposed license agreements were confidential and that it would not provide them to Photographers except subject to either an "attorneys' eyes only" restriction or with the financial terms related to how much Imagn was paid under the contract entirely redacted.  And yet the SDNY Defendants now claim and have represented to the court that the releases granted by Imagn are valid because Imagn *held itself out as Photographers' agent* and represented and warranted in the release itself that it was acting "on behalf of and in the name of the Photographers" (Arb. Demand Att. 16, § 2.1 and Att. 17, § 2.1).  But if Imagn *was* acting as Photographers' agent –

which of course it now denies – there can be no question that it breached its fiduciary duties to Photographers as its principals, both prior to and after the filing of the SDNY Action, thus precluding the bogus claim it now asserts here.

With such an obvious conflict of interest and given its own unclean hands and lack of good faith in dealing with Photographers, Imagn cannot now complain of a situation that has resulted entirely from its own bad acts. *See Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc*., 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992) ("A party's failure to act in good faith so as to facilitate the occurrence of a condition precedent requires the condition to be deemed satisfied or excused").

## VII.   Imagn's Counterclaim Fails Because The Purported Releases It Granted Are Invalid As Imagn Failed To Provide Notice and Obtain Consent For An Aggregated, Class-Based Settlement and Release.

Imagn purported to settle not only the claims in the SDNY Action on behalf of the Photographers as a *group*, but also *all* claims that *any* of its contributing photographers may have had against the third-party distributors and all of their sublicensees (named and unnamed), as part of an aggregated, class-based settlement.  The Reuters and Sipa settlement agreements define "Photographers" as "all of Imagn's counterparties to the Photographer Agreements, including but not limited to [the Photographers/plaintiffs in the SDNY Action]."  Thus, despite claiming in this arbitration that a class action is prohibited under the contracts and that the "proposed class inappropriately groups together photographers . . . whose relationships with Imagn are governed by materially different terms" (Imagn Answer at 5), Imagn purported to do the same thing in its dealings with third parties by aggregating each Photographer's individual claims together with *every photographer that ever signed its contributor agreement* and to settle and release claims on behalf of this class of all Imagn contributors.

Imagn's filings here make no effort whatsoever to address this glaring contradiction, which cuts to the very heart of the matter.  Imagn fails to address this problem because it has no valid

legal basis for unliterally and without notice aggregating claims held by different photographers that it claims are each "independent contractors" and who are not in privity with one another.

And shockingly, Imagn aggregated the claims of every contributor and granted these class-based settlements and releases without ever notifying or seeking the informed consent of any of its contributors beforehand or properly apportioning the proceeds from such claims, despite them having varying interests.  Imagn's decision to aggregate the claims of all contributors together without notice or consent and without disclosing its own interest in the transaction are contrary to its duties to deal with its contributors fairly and in good faith, and constitute grounds for voiding the release.  *See Hernandez v. Between the Bread 55th Inc*., 496 F. Supp. 3d 791, 804 (S.D.N.Y. 2020) (noting that "where a fiduciary engages in a self-interested transaction, the courts engage in an entire fairness review" and "the fiduciary must show it acted with utmost good faith and the most scrupulous inherent fairness of the bargain") (internal quote and citation omitted); Restatement (Third) of Agency § 8.06(2) ("An agent who acts for more than one principal in a transaction between or among them has a duty to deal in good faith with each principal").  Indeed, Imagn *still* has not notified any of its other contributors of these release agreements or advised Photographers or the other contributors how it calculated the settlement amounts, what amount each contributor is entitled to and the basis for that calculation, or made any payments to Photographers from the supposed settlements.[7]

---

[7] Although Imagn claims in its Answer that "the photographers' shares of that total [Reuters settlement] amount were already paid by Imagn in 2020" (Imagn Answer at 12), it never notified Photographers that any payments purportedly were made in settlement of or in exchange for a release of legal claims and instead characterized these payments as ordinary licensing royalties.  It also never identified any specific claims or unauthorized uses of photographs that were the subject of these payments, and its Answer fails to make any effort to explain how it paid these royalties in 2020 despite not agreeing to settle the claims until many months later in February and March 2021. Conspicuously, Imagn also fails to disclose the terms of either its "Contributor Agreement" with Reuters or the June 29, 2020 "amendment" thereto that was disclosed for the first time to Photographers through the Reuters settlement agreement.

In addition to lacking a contractual basis for pursuing a class-based settlement without proper notice to and consent from its contractual partners whom it now claims cannot of their own volition aggregate their own claims in formal arbitration, such broad, sweeping release agreements also violate New York's professional ethics rules related to aggregated settlements.  Specifically, Rules 1.8(g) and 1.8(h) of the New York Rules of Professional Conduct prohibit lawyers from participating in aggregated settlements without "informed consent" of clients and from "settl[ing] a claim or potential claim for such liability with an unrepresented client . . . unless that person is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel in connection therewith."

### VIII.   Imagn's Own Course Of Conduct Undercuts Its Counterclaim.

Imagn's consistent course of conduct also belies any allegation that sufficient "notice" was not provided regarding its decision not to pursue the claims in the SDNY Action.  Communications between Imagn and Photographers have *never* been made by certified or registered mail and have almost always been conducted via e-mail.  Indeed, all of the royalty statements and other notices from Imagn related to their contracts – including notification that it had settled the claims in the SDNY Action – have been sent via e-mail.  Under the strict terms of the contracts, the Photographers were never notified that Imagn had done *anything* related to the third-party resellers, and yet Imagn now claims that Photographers breached their contracts "by continuing to press the SDNY Action even though Imagn has granted Reuters, SIPA, and their sublicensees full releases."  (Counterclaim ¶ 5.)  The Photographers never received any of those release agreements in the mail.

Moreover, upon information and belief, Imagn has engaged in a consistent course of conduct of authorizing and granting "permission" to contributors, under both the 2011 and 2020

agreements, to proceed with lawsuits against third parties by e-mail and has never insisted that such authorizations be conveyed by certified or registered mail.

**IX.      Imagn Failed To Mitigate Its Alleged Damages.**

Imagn alleges that it "faces potentially significant indemnification demands from defendants in the SDNY Action for the defense costs they have incurred and continue to incur" and that "the amount involved is currently approximately $125,000 and continues to accrue as the SDNY Action continues." (Counterclaim ¶¶ 6, 9.)  If true,[8] Imagn has only itself to blame, as it purported to *settle* the claims in the SDNY Action – which it asserts was done magnanimously, "in its best business judgment, for not only its benefit but also that of all of its contributors" (Imagn Answer at 11) – and yet, curiously, it waited many months after the litigation was filed to grant a release and, apparently, many months after it received the settlement payment and also agreed to an express carve-out of any claims for indemnity in its own release.  (*See* Arb. Demand Att. 16 and 17, § 2.2).  Obviously, Imagn knew when it entered into the settlement agreements with Reuters and Sipa that the Photographers had initiated the SDNY Action and any defense costs incurred up to that point could be subject to a demand for indemnification.  Yet apparently, "in its best business judgment," it chose to simply exclude such claims from the settlement.  Why agree to a settlement payment of approximately $36,000 to purportedly release claims against Reuters/Sipa that was intended "to bring the SDNY Action to a close" when Imagn must have

---

[8] The Photographers are highly skeptical of this amount, given that the SDNY Action has only just begun and any billable hours should be relatively minimal.  Moreover, any of the fees incurred by the SDNY Defendants related to Photographers' efforts to obtain a copy of the license agreement(s) between them and Imagn cannot possibly be the subject of a claim as that is a necessary condition to triggering the requirements of Section 7 and Photographers had every right to demand that Imagn demonstrate that Section 7 even applies.  Nor can Imagn seek to recover any fees that the SDNY Defendants incurred prior to providing notice to Photographers of the existence of the purported settlement agreements, as Imagn never notified Photographers that it objected to the filing of the SDNY Action and/or was negotiating a release of claims under Section 7.

known that Reuters could soon demand at least that much (and apparently more) through an indemnification demand?  The answer is obvious; Imagn has a clear conflict of interest here and the settlement agreements were a sham, transparent attempt to limit Imagn's own liability and shift its burden to the Photographers, knowing that it faced claims by the Photographers in arbitration and purposefully leaving intact the basis for its Counterclaim.

Given that this was an aggregated and class-based settlement, the agreements and the negotiations that led to them (likely between counsel for Imagn and counsel for the SDNY Defendants) must be subject to an "entire fairness review," and Imagn cannot escape such a review by disclaiming that it acted as an agent in the transactions given that the agreements themselves expressly purport to be "in the name of" and "on behalf of" all of Imagn's contributors and the SDNY Defendants have represented in federal court that Imagn held itself out as the contributors' agent in those negotiations.  (*See* SDNY Action, Dkt. No. 57 at 14 (asserting that "acting through their agent Imagn, Plaintiffs have already released each of the Defendants from the liability they assert in this action.").)   And upon that review, Imagn will fail to meet its heavy burden to "show that it acted with utmost good faith and the most scrupulous inherent fairness of the bargain," particularly given that it granted these releases behind the backs of and over the objections of the Photographers, sold out these claims for a pittance to protect its own self-interests, and still refuses to produce copies of the underlying license agreements or share with the Photographers the communications and negotiations with the SDNY Defendants, or explain how it calculated the settlement amount or apportioned that payment across the claims of the entire class of its contributors.

At the very least, Imagn failed to mitigate any damages by waiting many months to settle these claims, which first were brought to the attention of Imagn in June 2020, and despite claiming

to have received the settlement payment many months prior to entering into the settlements.  In fact, Imagn was given express notice that Photographers intended to file suit to pursue these claims in an e-mail to Bruce Odle on September 15, 2020 – to which he responded that he "received [the] message" and requested "a couple more days [to provide] a formal response," which was also conveyed by e-mail – and the Photographers filed the SDNY Action on October 30, 2020.   And yet at no point during those intervening six weeks did Imagn ever state that it objected to Photographers bringing such claims or that it intended to take any action with respect to pursuing or resolving the claims in the SDNY Action itself.  Imagn did not seek to intervene in the SDNY Action, and still has not made any such effort.  Instead, Imagn sat on its hands for many months and even *voluntarily* agreed to participate in a mediation that expressly was intended to address the Photographers' claims in the SDNY Action, again without ever mentioning once during that time or the mediation process that it objected to the Photographers bringing their claims in the SDNY Action or advising Photographers that it believed it was the proper party to bring such claims.  If Imagn truly believed it had the authority to bring and settle such claims, it had a duty to act on such belief in a timely manner – either by alerting Photographers that it objected to their bringing such claims or settling with the SDNY Defendants sooner – and not allow its purported damages to mount for many months while doing nothing.

Imagn also failed to mitigate its damages based on defense costs incurred prior to the settlement agreements by deliberately agreeing to exclude those costs from consideration.  If Imagn is correct that is has absolute authority to settle claims, it reasonably could have and should have settled the *full scope* of claims, not purposefully leave itself exposed to an obvious indemnification claim.  Imagn thus failed to mitigate its own alleged damages.  *See Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985) ("New York courts adhere to the universally

accepted principle that a harmed plaintiff must mitigate damages" and parties are "obligated to take whatever reasonable actions they could to minimize their damages.").

**X.      Any Damages Available To Imagn Should Merely Act As An Setoff.**

Lastly, and at worst for Photographers, in the event that the panel determines that Photographers breached their contracts by filing the SDNY Action and thus owe damages to Imagn through indemnification, such damages should act as a setoff of Imagn's damages to Photographers, to be determined at trial.  *See Global Crossing Bandwidth, Inc. v. OLS, Inc*., No. 05-CV-6423L, 2009 WL 763483, at *10 (W.D.N.Y. Mar. 19, 2009) ("The merits of those counterclaims, and the extent to which they may offset [plaintiff's] damages, are to be decided at trial.").

## CONCLUSION

For the foregoing reasons, the Photographers deny the allegations of Imagn's Counterclaim.  Photographers respectfully request that the Counterclaim and any relief sought therefrom by Imagn be denied.

Dated:  May 27, 2021
        New York, New York.

                              Respectfully submitted,


                      By:    /s/ Kevin P. McCulloch      /
                             Kevin P. McCulloch
                             Nate A. Kleinman
                             McCulloch | Kleinman Law
                             501 Fifth Avenue, Suite 1809
                             New York, New York 10017
                             T: (212) 355-6050
                             kevin@mkiplaw.com
                             nate@mkiplaw.com

                             *Attorneys for Claimants/Counterclaim Defendants*